1  Carney R. Shegerian, Esq., State Bar No. 150461
   CShegerian@Shegerianlaw.com
2  Mahru Madjidi, Esq., State Bar No. 297906
   MMadjidi@Shegerianlaw.com
3  SHEGERIAN & ASSOCIATES, INC.
   320 North Larchmont Boulevard
4  Los Angeles, California 90004
   Telephone Number:      (310) 860 0770
5  Facsimile Number:      (310) 860 0771

Electronically FILED by
Superior Court of California,
County of Los Angeles
6/11/2025 6:57 PM
David W. Slayton,
Executive Officer/Clerk of Court,
By A. Munoz, Deputy Clerk

6  Attorneys for Plaintiff,
   LYNETTE JONES

8          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9       **FOR THE COUNTY OF LOS ANGELES, CENTRAL DISTRICT**

11 LYNETTE JONES,                          Case No.: 25STCV16980

12        Plaintiff,                       **PLAINTIFF LYNETTE JONES'**
                                           **COMPLAINT FOR DAMAGES FOR:**
13 vs.
                                           **(1) DISCRIMINATION IN VIOLATION**
14 KROENKE SPORTS & HOLDINGS                   **OF THE FEHA;**
   LLC, KROENKE SPORTS &
15 ENTERTAINMENT, LLC,                     **(2) HOSTILE WORK ENVIRONMENT**
   SKYCAM, LLC, KSE SPORTSMAN                 **HARASSMENT IN VIOLATION OF**
16 MEDIA, INC., KSE OUTDOOR                    **THE FEHA;**
   SPORTSMAN GROUP, LLC, KSE
17 MEDIA VENTURES, LLC,                    **(3) RETALIATION IN VIOLATION OF**
   ALTITUDE SPORTS &                           **THE FEHA;**
18 ENTERTAINMENT, LLC,
   KEIRSTIN BECK, and DOES 1 to           **(4) FRAUD/DECEIT;**
19 100, inclusive,
                                           **(5) NEGLIGENT HIRING,**
20        Defendants.                          **SUPERVISION, AND RETENTION;**

21                                         **(6) WRONGFUL TERMINATION OF**
                                               **EMPLOYMENT IN VIOLATION**
22                                             **OF PUBLIC POLICY;**

23                                         **(7) WHISTLEBLOWER**
                                               **RETALIATION (LABOR CODE**
24                                             **§ 1102.5); and**

25                                         **(8) INTENTIONAL INFLICTION OF**
                                               **EMOTIONAL DISTRESS.**
26
                                           **DEMAND FOR JURY TRIAL**
27

28

─────────────────────────────────────
PLAINTIFF'S COMPLAINT FOR DAMAGES

Plaintiff, Lynette Jones, alleges, on the basis of personal knowledge and/or information and belief:

## SUMMARY

This is an action by plaintiff, Lynette Jones ("plaintiff" or "Jones"), whose employment with defendants Kroenke Sports & Holdings LLC, Kroenke Sports & Entertainment, LLC, SKYCAM, LLC, KSE Sportsman Media, Inc., KSE Outdoor Sportsman Group, LLC, KSE Media Ventures, LLC, and Altitude Sports & Entertainment, LLC, (hereinafter, "Entity Defendants") was wrongfully terminated. Plaintiff brings this action against defendants for economic, non-economic, compensatory, and punitive damages, pursuant to Civil Code section 3294, pre-judgment interest pursuant to Code of Civil Procedure section 3291, and costs and reasonable attorneys' fees pursuant to Government Code section 12965(b), Labor Code section 1102.5(j), and Code of Civil Procedure section 1021.5.

## PARTIES

1. *Plaintiff:* Plaintiff Jones is, and at all times mentioned in this Complaint was, a resident of the County of Los Angeles, California.

2. *Defendants:*

   a. Defendant **Kroenke Sports & Holdings, LLC** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took place, was and is in the County of Denver, Colorado.

   b. Defendant **Kroenke Sports & Entertainment, LLC** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took

place, was and is in the County of Denver, Colorado.

c.   Defendant **SKYCAM, LLC** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Upon information and belief, Defendant's place of business, where the following causes of action took place, was and is in the County of Los Angeles, California.

d.   Defendant **KSE Sportsman Media, Inc**., is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took place, was and is in the County of Los Angeles, California.

e.   Defendant **KSE Outdoor Sportsman Group, LLC** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took place, was and is in the County of Los Angeles, California.

f.   Defendant **KSE Media Ventures, LLC** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took place, was and is in the County of Denver, Colorado.

g.   Defendant **Altitude Sports & Entertainment** is, and at all times mentioned in this Complaint was, authorized to operate by the State of California and the United States government and authorized and qualified to do business in the County of Los Angeles. Defendant's place of business, where the following causes of action took place, was and is in the County of Denver, Colorado.

h.   Defendant **Keirstin Beck** ("defendant" or "Beck") is, and at all times mentioned in this Complaint was, a supervisor with defendants. Defendant Beck is, and at

all times mentioned in this Complaint was, a resident of Denver, Colorado.

3. *Doe defendants:* Defendants Does 1 to 100, inclusive, are sued under fictitious names pursuant to Code of Civil Procedure section 474. Plaintiff is informed and believes, and on that basis alleges, that each of the defendants sued under fictitious names is in some manner responsible for the wrongs and damages alleged below, in so acting was functioning as the agent, servant, partner, and employee of the co-defendants, and in taking the actions mentioned below was acting within the course and scope of his or her authority as such agent, servant, partner, and employee, with the permission and consent of the co-defendants. The named defendants and Doe defendants are sometimes hereafter referred to, collectively and/or individually, as "defendants."

4. *Relationship of defendants:* All defendants compelled, coerced, aided, and/or abetted the discrimination, retaliation, and harassment alleged in this Complaint, which conduct is prohibited under California Government Code section 12940(i). All defendants were responsible for the events and damages alleged herein, including on the following bases: (a) defendants committed the acts alleged; (b) at all relevant times, one or more of the defendants was the agent or employee, and/or acted under the control or supervision, of one or more of the remaining defendants and, in committing the acts alleged, acted within the course and scope of such agency and employment and/or is or are otherwise liable for plaintiff's damages; (c) at all relevant times, there existed a unity of ownership and interest between or among two or more of the defendants such that any individuality and separateness between or among those defendants has ceased, and defendants are the alter egos of one another. Defendants exercised domination and control over one another to such an extent that any individuality or separateness of defendants does not, and at all times herein mentioned did not, exist. Adherence to the fiction of the separate existence of defendants would permit abuse of the corporate privilege and would sanction fraud and promote injustice. All actions of all defendants were taken by employees, supervisors, executives, officers, and directors during employment with all defendants, were taken on behalf of all defendants, and were engaged in, authorized, ratified, and approved of by all

other defendants.

5.   Entity Defendants both directly and indirectly employed plaintiff Jones, as defined in the Fair Employment and Housing Act ("FEHA") at Government Code section 12926(d).

6.   In addition, Entity Defendants compelled, coerced, aided, and abetted the discrimination, which is prohibited under California Government Code section 12940(i).

7.   Finally, at all relevant times mentioned herein, all defendants acted as agents of all other defendants in committing the acts alleged herein.

## VENUE

8.   The actions at issue in this case occurred in the State of California, in the County of Los Angeles.  Under the California Fair Employment and Housing Act, this case can alternatively, at Plaintiff's choice, be filed:

> [I]n any county in the state in which the unlawful practice is alleged to have been committed, in the county in which the records relevant to the practice are maintained and administered, or in the county in which the aggrieved person would have worked or would have had access to the public accommodation but for the alleged unlawful practice, but if the defendant is not found within any of these counties, an action may be brought in the county of the defendant's residence or principal office.

(California Government Code § 12965(c)(3).)

9.   Here, the plaintiff worked primarily remotely from her home in Van Nuys, in the City of Los Angeles, and in the County of Los Angeles. The majority of the unlawful actions on the part of the defendants occurred at the City of Los Angeles, in the County of Los Angeles.

10.   "[I]n the absence of an affirmative showing to the contrary, the presumption is that the county in which the title of the actions shows that the case is brought is, prima facie, the proper county for the commencement and trial of the action." (*Mission Imports, Inc. v. Superior Court* (1982) 31 Cal.3d 921, 928.) The FEHA venue statute – section 12965(b) – thus affords a wide choice of venue to persons who bring actions under FEHA.

-4-

(*Brown v. Superior Court* (1984) 37 Cal.3d 477, 486.) "[T]he special provisions of the FEHA venue statute control in cases involving FEHA claims joined with non-FEHA claims arising from the same facts." (*Id.* at 487.)

## FACTS COMMON TO ALL CAUSES OF ACTION

11. *Plaintiff's hiring, and Defendants' fraudulent misrepresentations to induce Plaintiff's hiring:*

a. Lynette Jones is a well-established, experienced attorney who has served in a legal counsel position for a number of large reputable companies, including Warner Bros., AT&T Entertainment, and DIRECTV. Immediately prior to beginning her employment with Entity Defendants, Jones held the position of Principal Counsel for Commercial Marketing at The Walt Disney Company.

b. In or around late February of 2023, a professional colleague of Jones' who served as General Counsel for an NBA team, informed Jones that she was recommending Jones for an open position for Assistant General Counsel with Entity Defendants. Entity Defendants' businesses involved work with a number of sports teams, which was of great interest to Jones.

c. In or around March of 2023, following a series of interviews, including with Defendant Keirstin Beck, Jones was offered the position. The Assistant General Counsel job posting stated that the salary for the position ranged from $275,000 to $300,000, depending on level of experience. In light of Jones' extensive experience and impressive credentials, Jones requested $300,000, but despite being a top candidate, Entity Defendants offered her the figure at the very bottom of that range ($275,000).

d. After further discussion, Jones and Defendants ultimately agreed that Jones would be paid a salary of $275,000, but would also be paid $25,000 relocation payment, which would equal the $300,000 Jones requested.

e. Jones was living in the City of Los Angeles, in the County of Los Angeles at the time. Taking the Assistant General Counsel role meant that Jones would need to

relocate to Denver, Colorado, where she was going to have a one-day-a-week in the office requirement. Relocating to Denver would take significant time and expense, so the relocation payment offered to Jones in lieu of the higher salary would help offset the significant relocation costs Jones would incur. During these pre-hiring discussions, Beck herself represented to Jones on multiple occasions that Jones would receive the $25,000 in relocation assistance, despite Beck and Defendants having no intention of following through with this payment.

     f.  Jones requested that the terms of her relocation be included in her offer letter, but was informed that there would be a separate moving expenses agreement provided to Jones, and that her employment offer letter would reflect this.

     g.  Defendants even made false representations in Jones' offer letter, stating that Jones would receive reimbursement of moving expenses.  The offer letter expressly misrepresents that "[Entity Defendants] will reimburse you for moving expenses by separate agreement." At no point did Defendants ever provide Jones with the separate agreement, and Jones never received a single penny for any payment or reimbursement of her moving expenses, despite multiple requests for resolution, and disclosures that there was a breach of the terms of her offer letter.  Throughout her employment, Jones complained about Defendants' false representations about her pay and moving expenses, and failure to comply with the terms of her offer letter. In response, Defendants retaliated against Jones for making these disclosures.

12.  *Plaintiff's job performance:*

     a.  With 12 years of commercial contracting experience with some of the top media brands in the world, Jones was incredibly knowledgeable and performed exceptionally during her employment with Entity Defendants in areas of marketing, sales, media licensing, employment, risk mitigation, commercial real estate leasing, and outside counsel management, among other tasks assigned by Beck.  Jones' performance was so impressive, that even after Defendants' false and pretextual termination of Jones' employment,  Defendants *still* asked Jones to stay another week to help with assignments

that needed her high level of expertise.

13. *Plaintiff's protected status and activity:*

a. Jones is an African-American female who was over the age of 40 during her employment with Entity Defendants.

b. Jones made a number of protected complaints throughout her employment, as detailed further herein, and was retaliated against for disclosing violations and making protected complaints.

14. *Entity Defendants*:

a. Entity Defendants are comprised of a number of different companies that are owned by Stanley Kroenke, a resident of California. During her employment, Jones performed work for all Entity Defendants, and was directly and indirectly employed by each of the Entity Defendants.

b. Entity Defendants have a large presence in California, owning multiple sports related entities in Los Angeles, including but not limited to the Los Angeles Rams.

c. Entity Defendants also have large scale real estate development projects and ownership of significant real estate in Los Angeles, including the SoFi Stadium, Hollywood Park, and more.

d. During her employment, Jones worked on contract negotiations for Entity Defendants, including a contract between Entity Defendants and the Los Angeles Rams.

e. All of the Entity Defendants were qualified to do business in California, and some were even registered to do business in California, including KSE Sportsman Media, Inc., and KSE Outdoor Sportsman Group, LLC. Jones drafted and negotiated complex license deals, production contracts, and performed work for both of these Defendants as well.

15. *Plaintiff's employment status:*

a. During Jones' employment, Jones was treated as a California employee, paying Jones' wages to her California address, issuing her W-2 tax forms to her California address, and reporting her wages to the State of California.

b.   Jones remained a resident of Los Angeles County throughout her employment with Entity Defendants.  Jones was never able to fully move to Colorado and was not paid her moving relocation expenses, which resulted in Jones incurring significant expenses, including but not limited to having to frequently travel to her Los Angeles residence to work remotely for a majority of the time she was employed by Entity Defendants.

c.   Jones was terminated on January 30, 2024; her last official day of work was February 9, 2024.

16.   *Defendants' adverse employment actions and behavior:*

a.   On March 22, 2023, in reliance on the false representations Defendants made about providing her relocation payment, Jones signed Defendants' offer letter.  Before she began her employment with Defendants, Jones also disclosed a number of pre-paid travel plans and corresponding dates of work that she would be unavailable for. Jones was fully transparent about this time off , and her and Beck reached an agreement that the pre-paid travel would not count as company PTO.  Beck approved the time off and said it was not going to be any issue at all.

b.   Shortly after Jones began her employment on May 1, 2023, Beck began incessantly questioning Jones on her age, pushing to find out how old Jones was.  This conduct was offensive, severe, invasive, and harassing. On one occasion, Jones shared how she lost her father during the peak of the COVID-19 pandemic, to which Beck's response was not one of empathy or care, but rather, taking this opening to harass Jones about her age, asking Jones *how old she was* when her father passed away.  This offensive tirade of age-based questioning went on for months, with Beck pressing Jones about why she would not share her age with Beck. Jones responded she was not comfortable discussing age in the workplace.

c.   Jones also observed that Beck was much more friendly, approachable, and fostering of similarly situated younger and/or Caucasian employees, such as, Taylor White, a Caucasian male attorney in his 30's hired shortly after Jones was.

d.   Shortly after Entity Defendants hired Jones, Beck informed Jones that Jones would be attending a large National Basketball Association General Counsel meeting in Sacramento, California, because Jones' responsibilities included performing legal work for the Denver Nuggets NBA Basketball Team. Jones was very much looking forward to meeting, getting to know, and collaborating with all of the NBA teams' general counsel at this meeting. It was important for Jones to establish relationships with attorneys of other NBA teams in order to better serve Defendants in her role.

e.   In June of 2023, Beck assigned Jones a file and asked Jones to, among other things, to negotiate the amounts of invoices for fees that Entity Defendants were billed from retaining outside work. When reviewing the file, it became immediately apparent to Jones that the invoices were not reviewed closely, if at all.  In or around that same month, Jones made it a point to circulate and implement a new process whereby moving forward, department staff whose names were listed on an invoice had to review and verify the invoice detail where the names appeared in order to confirm the accuracy of the invoice. Jones informed Beck of her concerns about the oversight of invoice processing and the effect on company finances.

f.   During her employment, Jones became aware of other questionable conduct. Jones observed Beck asking a subordinate to use their corporate credit card to make a charge on the subordinate's  corporate credit card so that Beck could avoid using her own corporate credit card.  Beck was the only person who approved subordinates' expenses. This arrangement with subordinates allowed Beck to make purchases that would otherwise face scrutiny by the Finance Department if the purchases were made on Beck's own corporate credit card.  This behavior of circumventing the company's checks and balances of Beck's expenses added to the overall concerns that Jones had about Beck's conduct.

g.   In June and July of 2023, Jones politely followed up about the agreed upon relocation payment she was owed, as it was difficult for her to fully move to Colorado without this payment. Each time Jones disclosed the issue of Entity Defendants not complying with the agreed upon terms of her employment, Beck stated that she would

look into it with Human Resources, or would respond that she forgot to talk to Human Resources, and provided other similar excuses.

h.   In late July of 2023, Beck informed Jones for the first time that  Jones would no longer be attending the NBA General Counsel meeting in Sacramento, and, instead, White would attend in her place, along with a paralegal (who was also Caucasian).  Jones was stunned and expressed concerns about missing out on such an important professional development opportunity that would strengthen her ability to perform for Defendants. Jones shared with Beck that her absence could be viewed negatively given she was the second highest ranked counsel with Entity Defendants. In response, Beck blamed Jones' pre-paid travels that Beck had approved months back, as the reason for uninviting her—a clear false reason for Jones' sudden exclusion from the NBA meeting, following complaints Jones had made about not receiving her agreed upon relocation payment.

i.   Jones continued to experience Defendants' gender- and race-based,  biased work environment as her employment continued.  On or around September 19, 2023, Jones was on a call with a male Caucasian attorney at ESPN, when this male began yelling at Jones to "Shut up and listen!"  Jones was appalled that she was being treated this way and responded back that it was unfair for the ESPN attorney to speak to her that way.

j.   On or around September 22, 2023, during a one-on-one with Beck, Jones told Beck about the misogynistic behavior exhibited by the male ESPN attorney. To Jones' surprise, Beck told Jones that she should expect that type of treatment and needs to accept it.  Beck went on to say that because Jones spoke up against the EPSN attorney on the call, someone from ESPN called Entity Defendants' COO, Matt Hutchings, and threatened that ESPN was going to cancel their contract. Jones questioned the veracity of Beck's statement because as Jones' call with the ESPN attorney continued, the ESPN attorney admitted that his team had made mistakes in the draft, overlooked some of Jones' questions, and promised to make revisions.  The parties signed and revised the contract. Despite the parties' agreement on the contract, Beck claimed that the contract would be cancelled, in an effort to discourage Jones from speaking up or against abusive,

misogynistic treatment or other malfeasance. Jones shared with Beck that Beck and Entity Defendants were casting *Jones* in a negative light as the aggressor, and suggesting that Jones was an angry Black woman.  Beck acknowledged that Entity Defendants are run by older White men which may explain Jones' feelings, but did nothing to investigate or address Jones discrimination complaint. Notably, Jones was one of only two Black employees with an executive level position.

k.   The next month on or around October 3, 2023, during discussions with White about a contract, White was condescending towards Jones and suggested that Jones was wasting time when trying to make sure the contracts were written properly.  This was another example of a double standard where others who were male and/or Caucasian were allowed to speak to Jones in a condescending tone and manner, yet the moment she expressed disagreement with a White male, she was considered to be out of line.

l.   Continuing to feel the disparate treatment and bias in her work environment as a Black woman, Jones requested to meet with Michele Sturgell, the Senior Vice President of Human Resources for Entity Defendants.

m.   On or around October 25, 2023, Jones and Sturgell met for lunch, per Jones' request.  During this meeting, Jones complained about how Beck was treating her differently than her white male colleague, White, and Beck had suggested removing Jones from the NBA meeting so that White could attend; how Beck was removing Jones' job responsibilities and job duties and giving them to White, marginalizing Jones' role; and treating Jones unfairly overall. Sturgell in essence told Jones that she was not going to stick her neck out for Jones, that Jones needed to accept this type of conduct, and offered no support or assistance.

n.   By November of 2023, Jones, who has been assigned to review legal bills for back in June, uncovered what appeared to be improper invoice charges that were neglectfully missed by Beck. When Jones brought this to Beck's attention and disclosed the issues, Beck was fearful of the situation given that part of Beck's responsibility was to oversee and review the legal departments budget.

o.    On or around November 28, 2023, Jones emailed Beck a photo and complaint about a racist White Power hand gesture a fan held up behind Jones' head while she was taking a photo at the Colorado Avalanche NHL game.    Given Entity Defendants' ownership of the Avalanche and the arena in which they play, Jones hoped something could be done to address the fan's racist conduct.  Beck claimed she would look into it the fan's racist conduct, but ultimately made excuses to Jones about not being able to determine who the fans in attendance were. Ultimately, Defendants did nothing to address Jones' complaint.

p.    Following her complaint about the White Power hand gesture, Jones was noticeably retaliated against and her position marginalized. She watched Beck confer with White on matters outside his expertise and even gave White free reign to message clients assigned to Jones, despite White's lack of expertise in complex matters.

q.    Entity Defendants still had not paid Jones the relocation payment owed under the terms of her offer letter.  As a result, Jones continued to disclose this breach of their agreement, and Jones continued to express the toll this delay was taking on her financially and emotionally, as she was still not able to fully move into her Colorado apartment.  By early January 2024, Beck had heard enough of Jones' complaints and told her to stop asking about the relocation payment, and made clear to Jones that this topic was closed for discussion.

r.    Approximately two weeks later, on January 23, 2024, Jones was called to a meeting with Sturgell and Beck, and was issued a performance improvement plan ("PIP"). Jones had never even received a warning or write up until this point, nor had there ever been any basis for one.  The PIP provided that Jones had 30 days to "improve" her performance, and provided vague critiques without any examples of the alleged performance shortfalls.  Jones expressed disagreement with the vague contents of the PIP and asked for specific examples, however, neither Beck nor Sturgell were able to provide any specifics. Later, towards the end of the meeting, Beck left, leaving only Sturgell and Jones in the meeting.  At this point, Jones complained to Sturgell that she felt that the PIP

was in retaliation for Jones' complaint to Beck about the racist White Power gesture by a Colorado Avalanche fan. Sturgell listened to Jones' complaints, including the false nature of the PIP, and told Jones she had the option of responding to the PIP in writing.  Jones affirmatively stated that she fully intended to respond to the PIP and address  its contents.

s.    On or around January 25, 2024, Beck and Sturgell scheduled another follow up meeting with Jones, this time  held over Teams. During this meeting, Beck and Sturgell pressed Jones about her response to the PIP and pushed her to provide them with a date by which she was going to submit her response.  Jones stated she would provide it by Tuesday the following week.

17.    *Defendants' termination of plaintiff's employment:*

a.    On the morning of Tuesday, January 30, 2024, on the date Jones promised to submit her PIP response, she emailed her response to Beck and Sturgell.  Approximately an hour later,  Jones had a meeting with Sturgell and Beck, where she was notified that her employment was terminated, with Beck citing that the Defendants relationship with Jones was irreparable—a false and pretextual reason to cover up Defendants' discriminatory and retaliatory motives for her termination. Although Defendants gave Jones 30 days to "improve" on the vague critiques contained in the PIP, they terminated her nearly days later, after Jones expressed that she believed the PIP to be retaliation for her complaints about the White Power discrimination she experienced, among other issues. Defendants informed Jones that her official last day would be February 9, 2024. Defendants then gave Jones a list of assignments to complete by her last day, proving that Defendants still relied on Jones' drafting, negotiation, and analytical expertise. Jones, a consummate professional, completed her work and transitioned matters for coverage by others by her employment end date of February 9, 2024.

18.    *Economic damages:* As a consequence of defendants' conduct, plaintiff has suffered and will suffer harm, including lost past and future income and employment benefits, damage to her career, and lost wages, overtime, unpaid expenses, and penalties, as well as interest on unpaid wages at the legal rate from and after each payday on which

those wages should have been paid, in a sum to be proven at trial.

19. *Non-economic damages:* As a consequence of defendants' conduct, plaintiff has suffered and will suffer psychological and emotional distress, humiliation, and mental and physical pain and anguish, in a sum to be proven at trial.

20. *Punitive damages:* Defendants' conduct constitutes oppression, fraud, and/or malice under California Civil Code section 3294 and, thus, entitles plaintiff to an award of exemplary and/or punitive damages.

a. *Malice:* Defendants' conduct was committed with malice within the meaning of California Civil Code section 3294, including that (a) defendants acted with intent to cause injury to plaintiff and/or acted with reckless disregard for plaintiff's injury, including by terminating plaintiff's employment and/or taking other adverse job actions against plaintiff because of her age, disability, medical leave, race, national origin, ancestry, pregnancy, gender, sexual orientation, and/or good faith complaints, and/or (b) defendants' conduct was despicable and committed in willful and conscious disregard of plaintiff's rights, health, and safety, including plaintiff's right to be free of discrimination, harassment, retaliation, abuse of the requirements of accommodation and engaging in the interactive process, and wrongful employment termination.

b. *Oppression:* In addition, and/or alternatively, defendants' conduct was committed with oppression within the meaning of California Civil Code section 3294, including that defendants' actions against plaintiff because of her age, disability, medical leave, race, national origin, ancestry, pregnancy, gender, sexual orientation, and/or good faith complaints were "despicable" and subjected plaintiff to cruel and unjust hardship, in knowing disregard of plaintiff's rights to a work place free of discrimination, harassment, retaliation, abuse of the requirements of accommodation and engaging in the interactive process, and wrongful employment termination.

c. *Fraud:* In addition, and/or alternatively, defendants' conduct, as alleged, was fraudulent within the meaning of California Civil Code section 3294, including that defendants asserted false (pretextual) grounds for terminating plaintiff's employment

and/or other adverse job actions, thereby to cause plaintiff hardship and deprive her of legal rights.

21.  *Attorneys' fees:* Plaintiff has incurred and continues to incur legal expenses and attorneys' fees.

22.  *Exhaustion of administrative remedies:* Prior to filing this action, plaintiff exhausted her administrative remedies by filing a timely administrative complaint with the California Civil Rights Department ("CCRD"), formerly known as the Department of Fair Employment and Housing ("DFEH"), and receiving a CCRD/DFEH right-to-sue letter.

**FIRST CAUSE OF ACTION**

**<u>Discrimination on the Bases of Age, Race, Color, Ancestry,</u>**

**<u>Ethnicity, and Gender/Sex</u>**

**<u>(Violation of Government Code § 12900, *et seq.*)</u>**

**Against Entity Defendants; and Does 1 to 100, Inclusive**

23.  The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

24.  At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants.  This statute requires defendants to refrain from discriminating against any employee because but not limited to he or she is more than 40 years old or because of the employee's race, color, ancestry, ethnicity and/or gender/sex.

25.  Plaintiff's age, race, color, ancestry, ethnicity and/or gender/sex and/or other characteristics protected by FEHA, Government Code section 12900, *et seq.,* were substantial motivating reasons in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse employment actions against plaintiff.

26.  As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has sustained and continues to sustain substantial losses

of earnings and other employment benefits.

27.   As a proximate result of defendants' willful, knowing, and intentional discrimination against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

28.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

29.   Defendants' discrimination was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages against defendants.

### SECOND CAUSE OF ACTION

**Hostile Work Environment Harassment on the Bases of
Age, Race, Color, Ancestry, Ethnicity, and/or Gender/Sex
(Violation of Government Code § 12900, *et seq.*)**

**Against All Defendants; and Does 1 to 100, Inclusive**

30.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

31.   At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants.  This statute requires defendants to refrain from harassing any employee because he or she is more than 40 years old or because of the employee's race, color, ancestry, ethnicity, and/or or gender/sex.

32.   Plaintiff was subjected to harassing conduct through a hostile work environment, in whole or in part on the bases of plaintiff's age, race, color, ancestry, ethnicity, and/or or gender/sex, and/or other protected characteristics, in violation of Government Code sections 12940(j) and 12923.

33.   Pursuant to Government Code section 12923(b), a single incident of harassing

conduct is sufficient to create a hostile work environment if the harassing conduct has unreasonably interfered with plaintiff's work performance or created an intimidating, hostile, or offensive working environment.

34.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

35.   As a proximate result of defendants' willful, knowing, and intentional harassment of plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

36.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

37.   Defendants' harassment was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages against defendants.

### THIRD CAUSE OF ACTION
### Retaliation for Engaging in Protected Activity
### (Violation of Government Code § 12900, *et seq.*)
### Against Entity Defendants; and Does 1 to 100, Inclusive

38.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

39.   At all times herein mentioned, FEHA, Government Code section 12940, *et seq.,* was in full force and effect and was binding on defendants. This statute requires defendants to refrain from retaliating against any employee making complaints or opposing discrimination, harassment, or retaliation, or otherwise engaging in activity protected by the FEHA, including for seeking to exercise rights guaranteed under FEHA and/or assisting and/or participating in an investigation, opposing defendants' failure to provide

rights, including rights to complain and to assist in a lawsuit, and/or the right to be free of retaliation, in violation of Government Code section 12940(h).

40.   Plaintiff's seeking to exercise rights guaranteed under FEHA and/or opposing defendants' failure to provide such rights, including the right to be free of discrimination, harassment, or retaliation, in violation of Government Code section 12940(h), were substantial motivating reasons in defendants' decision to terminate plaintiff's employment, not to retain, hire, or otherwise employ plaintiff in any position, and/or to take other adverse employment actions against plaintiff.

41.   As a proximate result of defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits.

42.   As a proximate result of defendants' willful, knowing, and intentional retaliation against plaintiff, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

43.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Government Code section 12965(b), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

44.   Defendants' retaliation was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages against defendants.

## FOURTH CAUSE OF ACTION
### <u>Fraud/Deceit</u>
### <u>(Civil Code § 1710)</u>
### Against All Defendants and Does 1 to 100, Inclusive

45.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

46.  At all times herein mention, Civil Code section 1710 was in full force and effect and was binding on defendants.  This statute prohibits defendants from asserting to plaintiff any statement that they knew was untrue or that they had no reasonable ground for believing to be true.

47.  The elements of fraud are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or "scienter"); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Small v. Fritz Companies, Inc.* (2003) 30 Cal.4th 167, 173.

48.  Defendants made knowingly false representations to Plaintiff about her compensation and covering her moving expenses, with no intention of providing the moving expenses payment Defendants represented Plaintiff was receiving as part of her job offer.

49.  Defendants made these false representations, concealing the truth and not disclosing their true intentions, with the intent that Plaintiff would rely on these representations.

50.  Plaintiff did indeed reasonably rely on these false representations, and was harmed.

51.  At the time these representations were made, Plaintiff was ignorant of their falsity and believed them to be true.

52.  As a proximate result of Defendants' false representations, plaintiff has been damaged in a sum according to proof.

53.  As a proximate result of Defendants' false representations, plaintiff suffered from both economic and non-economic losses.

54.  Defendants' conduct was committed intentionally, in a malicious, fraudulent, despicable and/or oppressive manner, and this entitled plaintiff to punitive damages against defendants.

///

///

## FIFTH CAUSE OF ACTION

### Negligent Hiring, Supervision, and Retention

### (*Doe v. Capital Cities* (1996) 50 Cal.App.4th 1038)

### Against Entity Defendants; and Does 1 to 100, Inclusive

55.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

56.   Defendants owed a duty of care to plaintiff to appoint, hire, retain, and supervise persons who would not engage in retaliatory, harassing, or discriminatory conduct. Defendants owed a duty of care to plaintiff not to retain managers or employees who would discriminate against, harass, or retaliate against employees for engaging in pro-tected activities. Defendants owed a duty of care to plaintiff to supervise their managers and employees closely to ensure that they would refrain from harassing and retaliating against plaintiff.

57.   Defendants breached these duties. As a result, defendants caused damages to plaintiff. As a proximate result of defendants' negligent hiring, retention, and supervision of their managers and employees, plaintiff has suffered and continues to suffer damages, including losses of earnings and benefits, according to proof.

## SIXTH CAUSE OF ACTION

### Wrongful Termination of Employment in Violation of Public Policy

### (*Tameny v. Atlantic Richfield Co.* (1980) 27 Cal.3d 167)

### Against Entity Defendants; and Does 1 to 100, Inclusive

58.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

59.   Defendants terminated plaintiff's employment in violation of various funda-mental public policies underlying both state and federal laws. Specifically, plaintiff's employment was terminated in part because of her protected status (*i.e.,* age, race, color, ancestry, ethnicity and/or gender/sex and/or protected activity). These actions and

Plaintiff's termination were in violation of, but not limited to, the FEHA, the California Constitution, Government Code section 12900, *et seq.*, and California Labor Code sections 1102.5, 232.5, 1710, 970, 98.6, 232, fraud, deceit, intentional and/or fraudulent misrepresentations, financial misfeasance, negligence, and/or financial negligence.

60.   As a proximate result of defendants' wrongful termination of plaintiff's employment in violation of fundamental public policies, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

61.   As a result of defendants' wrongful termination of her employment, plaintiff has suffered general and special damages in sums according to proof.

62.   Defendants' wrongful termination of plaintiff's employment was done intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages.

63.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to Code of Civil Procedure sections 1021.5 and 1032, *et seq.,* plaintiff is entitled to recover reasonable attorneys' fees and costs in an amount according to proof.

### SEVENTH CAUSE OF ACTION

### <u>Whistleblower Retaliation</u>

### <u>(Violation of Labor Code § 1102.5, *et seq.*)</u>

### Against Entity Defendants; and Does 1 to 100, Inclusive

64.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

65.   At all relevant times, Labor Code section 1102.5 was in effect and was binding on defendants. This statute prohibits defendants from retaliating against any employee, including plaintiff, for actually raising complaints of actual or potential illegality, for providing information of such actual or potential illegality, because the employee is believed to have engaged in such conduct, or because the employee may engage in such

conduct. The statute also further prohibits defendants from retaliating against any employee, including plaintiff, where the employee refused to participate in activity that would result in a violation of the law.

66.   Plaintiff raised complaints of actual and/or potential illegality, including but not limited to complaints about violations of, (including but not limited to), the FEHA, California Constitution, and Government Code Section 12900 *et seq.*, violations of California Labor Code sections 1102.5, 232.5, 1710, 970, 98.6, 232, fraud, deceit, intentional and/or fraudulent misrepresentations, financial misfeasance, negligence, and/or financial negligence. while she worked for defendants, and defendants retaliated against her by taking adverse employment actions, including employment termination, against her.

67.   As a proximate result of defendants' willful, knowing, and intentional violations of Labor Code section 1102.5, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

68.   As a result of defendants' adverse employment actions against plaintiff, plaintiff has suffered general and special damages in sums according to proof.

69.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages against defendants.

70.   Plaintiff has incurred and continues to incur legal expenses and attorneys' fees. Pursuant to California Labor Code section 1102.5(j), plaintiff is entitled to recover reasonable attorneys' fees and costs (including expert costs) in an amount according to proof.

///
///
///
///

PLAINTIFF'S COMPLAINT FOR DAMAGES

# EIGHTH CAUSE OF ACTION

## Intentional Infliction of Emotional Distress

## (*Hughes v. Pair* (2009) 46 Cal.4th 1035)

### Against All Defendants; and Does 1 to 100, Inclusive

71.   The allegations set forth in preceding paragraphs are re-alleged and incorporated herein by reference.

72.   Defendants' discriminatory, harassing, and retaliatory actions against plaintiff constituted extreme and outrageous misconduct and caused plaintiff severe emotional distress. Defendants were aware that treating plaintiff in the manner alleged above, including depriving plaintiff of her livelihood, would devastate plaintiff and cause her extreme hardship.

73.   As a proximate result of defendants' extreme and outrageous conduct, plaintiff has suffered and continues to suffer severe emotional distress.  Plaintiff has sustained and continues to sustain substantial losses of earnings and other employment benefits as a result of being emotionally distressed.

74.   As a proximate result of defendants' extreme and outrageous conduct, plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental and physical pain and anguish, all to her damage in a sum according to proof.

75.   Defendants' misconduct was committed intentionally, in a malicious, fraudulent, despicable, and/or oppressive manner, and this entitles plaintiff to punitive damages against defendants.

///

///

///

///

///

///

///

PLAINTIFF'S COMPLAINT FOR DAMAGES

## PRAYER

WHEREFORE, plaintiff, Lynette Jones, prays for judgment against defendants as follows:

1. For general and special damages according to proof;

2. For exemplary damages, according to proof;

3. For pre-judgment and post-judgment interest on all damages awarded;

4. For reasonable attorneys' fees;

5. For costs of suit incurred;

6. For declaratory relief:

7. For such other and further relief as the Court may deem just and proper;


ADDITIONALLY, plaintiff, Lynette Jones, demands trial of this matter by jury. The amount demanded exceeds $35,000.00 (Government Code § 72055).


Dated: June 11, 2025                     SHEGERIAN & ASSOCIATES, INC.


By: _____
Carney R. Shegerian, Esq.

Attorneys for Plaintiff,
LYNETTE JONES

PLAINTIFF'S COMPLAINT FOR DAMAGES